# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

General Mills, Inc.; and General Mills IP
Holdings II, LLC,

                Plaintiffs,

    v.

Fage Dairy Processing, S.A., a/k/a Fage
Dairy Industry S.A.; Fage USA Dairy
Industry, Inc.; and Fage USA Holdings,
Inc.,

                Defendants.

Civil No. 11-2683 (SRN/JJK)

**MEMORANDUM OPINION
AND ORDER**

---

Ronn B. Kreps, Fulbright & Jaworski L.L.P., 2100 IDS Center, 80 South 8th Street,
Minneapolis, MN 55402-2112; Linda L. Addison, Fulbright & Jaworski L.L.P., 666 Fifth
Avenue, New York, NY 10103-3198; and Richard Groos, Marcy Hogan Greer, and
Brandon Ress, Fulbright & Jaworski L.L.P., 98 San Jacinto Blvd., Suite 1100, Austin, TX
78701, for Plaintiffs.

Virginia R. Richard, Winston & Strawn LLP, 200 Park Avenue, New York New York
10166; and Lewis A. Remele, Jr., Kevin P. Hickey, and Carrie L. Hund, Bassford
Remele, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

    This matter is before the Court on the separate motions to dismiss brought by

Defendant Fage Dairy Processing Industry, S.A. (Doc. No. 75), and by its subsidiaries,

Defendants Fage USA Dairy Industry, Inc. and Fage USA Holdings, Inc. (Doc. No. 46),

as well as Fage USA Dairy Industry, Inc.'s motion to transfer this action to New York (or

stay it) (Doc. No. 101), and the motion of Plaintiffs General Mills, Inc., and General Mills

IP Holdings II, LLC ("General Mills"), to enjoin Defendants from proceeding with the

FILED 5/11/2012
RICHARD D. SLETTEN

JUDGMENT ENTD
DEPUTY CLERK  TS

138

separate action in New York (Doc. No. 80).  For the reasons stated below, this Court denies both motions to dismiss, denies the motion to transfer or stay, and denies the motion to enjoin.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

In 1998 and 2000, Defendant Fage Dairy Processing, S.A. ("Fage Greece") filed applications with the U.S. Patent & Trademark Office ("PTO") seeking registration of certain trademarks for its "Total" line of yogurt.  In 2006, Fage Greece filed additional applications for another set of marks for Fage Total.

In 2000, General Mills filed an opposition to the 1998 and 2000 applications on the grounds that Fage Greece's yogurt created a likelihood of confusion with, and a likelihood of dilution of, General Mills' trademark for its "Total" brand of cereal.  In 2008, General Mills likewise opposed Fage Greece's 2006 applications.  On September 14, 2011, the Trademark Trial and Appeals Board ("TTAB") denied Fage Greece's applications, having determined there would be a likelihood of confusion between the marks.

On September 16, 2011, General Mills filed the present action against Fage Greece and Defendant Fage USA Dairy Industry, Inc. ("Fage USA"), alleging infringement of General Mills' trademarks as well as other related claims.  (Doc. No. 1.)[1]  Fage Greece is a Greek corporation with its principal place of business in Greece.  (Doc. No. 50, Ex. C,

---

[1]      Pursuant to a stipulation of the parties, the Court later directed that the caption for this action be amended to add Defendant Fage USA Holdings, Inc. ("Fage Holdings"), and to clarify that Fage Greece is also known as Fage Dairy Industry S.A. (Doc. Nos. 71, & 72.)

¶ 13.) Fage USA, a "wholly-owned direct subsidiary of Fage Holdings" (Doc. No. 48, at 3), and a wholly-owned indirect subsidiary of Fage Greece, is a New York corporation with its principal place of business in New York (Doc. No. 50, Ex. C., ¶¶ 14, 15). Fage Holdings too is a New York corporation with its principal place of business in New York. In other words, "Fage USA is wholly owned by Fage USA Holdings, Inc., which in turn is wholly owned by Fage [Greece]." (Doc. No. 97, Ex. 2, at 53.)[2]

Fage Greece and Fage USA then moved to quash service, to dismiss Fage Greece for lack of personal jurisdiction, and to transfer this action to the Northern District of New York. (Doc. Nos. 5 & 12.) In response, General Mills argued that any defects in service had been cured, or were in the process of being cured. (Doc. Nos. 21 & 23.) Fage then withdrew its motion "without prejudice." (Doc. No. 45.) Service eventually was properly achieved on all three Defendants.

On September 30, 2011, Fage Greece and Fage USA, exercising their appellate rights under 15 U.S.C. § 1071, filed an action in the Northern District of New York against General Mills, seeking *de novo* review of the TTAB's decision denying

---

[2]    Fage Holdings, formerly Fage USA, Corp., was incorporated in June 2000 as a wholly owned subsidiary of Fage Greece. (Doc. No. 97, Ex. 2, at 42.) Fage USA was incorporated in February 2005 as a wholly owned subsidiary of Fage Holdings. (Id.) When Fage Holdings was originally incorporated, it was under the name Greek Foods Imports, Inc. (Doc. No. 78, Ex. A, ¶ 10.) "In 2003, Greek Foods Imports, Inc. changed its name to Fage USA, Corp. In 2009 Fage USA Corp. changed its name to Fage USA Holdings, Inc." (Id.) Thus, the present Defendant Fage USA Dairy Industry, Inc. must be distinguished from Fage USA, Corp., now Defendant Fage Holdings. Finally, a fourth Fage entity, although not directly at issue here, is a new Fage USA, Corp. ("Fage Massachusetts"), which was incorporated under Massachusetts law on July 1, 2009, the same day that the then existing Fage USA, Corp. became Fage Holdings. (Doc. No. 96, ¶ 17.)

3

registration of Fage Greece's Class 29 marks (Count I), as well as a declaratory judgment that Fage's use of the marks does not infringe General Mills' mark for TOTAL wheat flake cereal (Count II) ("the New York action").  (No. 11-CV-1174, Doc. No. 1.)[3]  In the New York action, only Fage Greece and Fage USA, not Fage Holdings, are parties.  (Doc. No. 50, Ex. C.)  Fage Greece was the sole Fage entity, however, in the proceedings before the TTAB seeking registration of U.S. trademarks.

Here, General Mills' First Amended Complaint, filed on November 1, 2011, asserts seven claims:  (1) three federal claims under the Lanham Act for trademark infringement, trademark dilution, and false designation of origin; (2) three claims under Minnesota state law (two statutory and one common law); and (3) a "claim" for alter ego liability against Fage Greece.  (Doc. No. 26.)

Defendants now seek dismissal on several grounds.  Fage Greece contends that this Court lacks personal jurisdiction over it.  (Doc. No. 75.)  Fage Holdings also moves to dismiss for lack of personal jurisdiction.  (Doc. No. 46.)  In addition, Fage Holdings, along with Fage USA, move (1) to dismiss the federal and state claims for trademark dilution for failure to state a claim on which relief may be granted; (2) to dismiss General Mills' "claim" for alter ego liability; (3) to dismiss the federal dilution claim and all state claims for being time-barred, and (4) to dismiss (or restrict) General Mills' request for injunctive relief.  (Id.)  Fage Greece joins in that portion of its subsidiaries' dismissal

---

[3]       Section 1071 provides a party "dissatisfied" with a TTAB decision with the option, in lieu of a conventional appeal to the Court of Appeals for the Federal Circuit, of filing an action in federal district court seeking *de novo* review of the TTAB's decision. 15 U.S.C. § 1071.

motion. (Doc. No. 75.) Finally, Fage USA moves to transfer this action to the Northern District of New York, where Fage Greece and Fage USA's action is pending (or, alternatively, to stay this action). (Doc. No. 101.) Plaintiffs not only oppose that motion, but also move to enjoin Defendants from proceeding with that action. (Doc. No. 80.)

## II.   DISCUSSION

The Court will first turn to the question of personal jurisdiction over Fage Greece and Fage Holdings.[4] Not only is this Court obligated to first assure itself of its jurisdiction, the outcome of those jurisdictional motions may impact the remaining motions.

### A.   Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss, a plaintiff need make "only a *prima facie* showing of jurisdiction" and this Court views "the evidence in the light most favorable" to Plaintiffs. Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 592 (8th Cir. 2011).[5] If the defendant disputes jurisdiction, "the plaintiff has the burden of proving facts supporting personal jurisdiction." Miller v. Nippon Carbon Co., Ltd., 528 F.3d 1087, 1090 (8th Cir. 2008). The requisite showing is "tested, not by the pleadings alone, but by" the evidentiary record. Id.

_____

[4]     Fage USA does not contest personal jurisdiction. (Doc. No. 48, at 6-10 (arguing only that jurisdiction is lacking over Fage Holdings).)

[5]     "Nevertheless, '[t]he party seeking to establish the court's in personam jurisdiction carries the burden of proof, and the burden does not shift to the party challenging jurisdiction.'" Id. (quoting Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003)).

Because Plaintiffs assert both federal and state-law claims against Defendants, the action is premised on a federal question, with the state-law claims being subject, potentially, to pendent jurisdiction. (Doc. No. 26, ¶¶ 11, 14.)[6]  In a federal question action, a federal court first determines whether federal law authorizes nationwide service of process. E.g. uBID, Inc. v. The GoDaddy Group, Inc., 623 F.3d 421, 425 (7th Cir. 2010); Sunward Elec., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004).  If such nationwide service does not exist, the court decides whether the state law of the forum permits the court to exercise personal jurisdiction consistent with the Due Process Clause. E.g. uBID, Inc., 623 F.3d at 425; Sunward Elec., Inc., 362 F.3d at 22.[7]  Here, there is no basis for nationwide service.  Neither 15 U.S.C. § 1114 nor § 1125, the basis for General Mills' Lanham Act claims, "contain such service of process provisions." Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996).  Accord Sunward Elec., Inc., 362 F.3d at 22 ("[T]he Lanham Act does not provide for national service of process.").  Thus this Court may exercise personal jurisdiction over a non-resident only if Minnesota's long-arm statute applies and the exercise would comport with due process. E.g., Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 593 (8th Cir. 2011).  Because the Minnesota Supreme Court has construed the State's long-arm statute to extend to the full reach of due process, the inquiry becomes a question of

---

[6]    Plaintiffs also assert that this Court would have diversity jurisdiction. (Id., ¶ 12.)

[7]    And in this context, the constitutional limits of due process derive from the Fifth, rather than the Fourteenth Amendment.  205 F.3d 1206, 1210 (10th Cir. 2000) (citing Omni Capital Int'l v. Rudolf Wolff & Co., 484 U.S. 97, 103-04 (1987)).

whether Fage Greece and Fage Holdings have the requisite minimum contacts with the

State such that the exercise of jurisdiction over them would not offend traditional notions

of fair play and substantial justice. Juelich v. Yamazaki Mazak Optonics Corp., 682

N.W.2d 565, 570 (Minn. 2004).

General Mills disavows any attempt to establish *general* personal jurisdiction over

Fage Greece or Fage Holdings–which would permit the Court to adjudicate any claim

against those Defendants. The Court agrees that there is no factual basis to conclude that

either entity was domiciled in Minnesota or that either could be "fairly regarded as at

home" in Minnesota so as to support general jurisdiction. Goodyear Dunlop Tires

Operations, S.A. v. Brown, ___ U.S. ___, 131 S. Ct. 2846, 2853-54, 2855-57 (2011).[8]

With respect to *specific* personal jurisdiction–which permits a more limited reach

of jurisdiction extending only to those claims arising out of or related to the non-

resident's contacts with the forum–the governing test remains "purposeful

availment"–"whether there was 'some act by which the defendant purposefully avail[ed]

itself of the privilege of conducting activities within the forum State, thus invoking [its]

benefits and protections.'" Goodyear Dunlop Tires Operations, ___ U.S. at ___, 131 S.

Ct. at 2854 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). Accord J. McIntyre

Machinery, Ltd. v. Nicastro, ___ U.S. ___, 131 S. Ct. 2780, 2787 (2011) ("As a general

---

[8]     There are no allegations that either entity maintains any business presence
in Minnesota–for example, that either is licensed or authorized to do business in
Minnesota, has agents or employees in Minnesota, or maintains an office, telephone
number, mailing address or bank accounts in Minnesota–and both Fage Greece and Fage
Holdings disavow the existence of any such contacts. (Doc. No. 77, at 9; Doc. No. 48, at
8.)

rule, the sovereign's exercise of power requires some act by which the defendant 'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'") (Kennedy, J.) (plurality).

Here, there is no question as to "the relation of the cause of action to the contacts," which serves as the basis for differentiating general from specific jurisdiction.[9] Because General Mills' claims all pertain to the sale of Defendants' yogurt, the question becomes whether Defendants have purposefully availed themselves of the privilege of doing business in Minnesota by directing sales of the allegedly infringing products to Minnesota.

### 1. Fage Holdings

The Court begins with Fage Holdings, an entity first incorporated in 2000, shortly after Fage's yogurt was first introduced in the United States. Two periods of Fage

---

[9]      As early as 1965, the Eighth Circuit distilled the governing law of personal jurisdiction over non-resident defendants down to a five-factor analysis, which included whether and how the defendant's contacts related to the cause of action. Aftanase v. Economy Baler Co., 343 F.2d 187 (8th Cir. 1965); accord Land-O-Nod Co. v. Bassett Furniture Indus., Inc., 708 F.2d 1338, 1340 (8th Cir. 1983). But these factors, despite sometimes being referred to as a "test," e.g., Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994), are only "general guidelines" that "do not establish a mathematical formula from which to derive fair play and substantial justice, but rather provide a general guide in applying that abstract concept." Caesar's World, Inc. v. Spencer Foods, 498 F.2d 1176, 1180 (8th Cir. 1974). As clarified in Land-O-Nod itself, "[t]hese factors do not provide 'a slide rule by which fundamental fairness can be ascertained with mathematical precision.'" 708 F.2d at 1340. "Ultimately," "'the central concern of the inquiry'" is "'the relationship among the defendant, the forum, and the litigation.'" Id. (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). This Court has considered those factors in the course of its analysis, which remains focused on whether Fage Greece and Fage Holdings have purposefully availed themselves of doing business in Minnesota.

Holdings' activities are relevant here:  (1) from 2000 until April 2008, when Fage USA began production at the New York facility; and (2) from April 2008 until the case was filed.

### (a)    2000 To April 2008

Although Fage Holdings asserts that since April 2008 it is now simply a holding company for Fage USA without any direct involvement in the production or sale of Fage yogurt in the United States, much less any purposeful contacts with Minnesota, this argument overlooks the fact that before Fage USA took over the production of Fage yogurt in the United States in April 2008, Fage Holdings, in its previous incarnation as Greek Food Imports and then as Fage USA, Inc., was the Fage entity distributing Fage yogurt in the United States.  (Doc. No. 78, Ex. A, ¶ 10 ("From approximately 2000 to 2007, Fage Holdings imported FAGE TOTAL products from Greece into the United States.").)

And as General Mills points out, Fage USA, the entity that since 2008 has been producing Fage yogurt in New York (and allegedly distributing it nationwide), has made no argument that it is beyond the jurisdiction of courts in Minnesota.  As Fage's counsel stated here, "[t]here's no dispute that the product is available on store shelves in Minnesota from 2008 and forward, there's no dispute about that."  (Doc. No. 111-1, at 13.)  And as the current CFO of Fage USA states, Fage USA distributes Fage yogurt "*directly* to regional and *national* grocery store chains and warehouse chains."  (Doc. No. 49, ¶ 14 (emphases added); accord Doc. No. 78, Ex. B (affidavit of Fage USA's Treasurer

and Fage Greece's CFO), ¶ 11 (emphases added).)  In October 2010, in the TTAB

proceedings, Fage Greece stated that "[t]oday, FAGE TOTAL Greek yogurt is available

nationwide." (Doc. No. 24, Ex. A-2, at 15.)  And most importantly, Fage now concedes

that from 2008 until February 2012, Fage USA sold yogurt in Minnesota to retailers such

as SuperValu Inc., a Minnesota retailer and wholesaler, and Aldi Einkaus GmbH & Co.

(Doc. No. 119, Ex. D (Shea Declaration, ¶ 5) (summarizing sales to Minnesota

wholesalers and/or retailers from 2008 to present)).)  The Court thus understands Fage

USA to concede, by not contesting personal jurisdiction here, that it purposefully

directed sales of Fage yogurt to Minnesota.

      Thus, insofar as those same functions were performed before 2008 by the entity

now known as Fage Holdings, there would seem to be little question that Fage Holdings

is likewise subject to this Court's jurisdiction.  "From approximately 2000 to 2007, Fage

Holdings imported FAGE TOTAL products from Greece into the United States." (Doc.

No. 49, ¶ 4; Doc. No. 78, Ex. A, ¶ 10.)  U.S. sales, which amounted to 2,000 tons in 2004

("The Fage Story," www.fageusa.com), had been steadily increasing throughout that

period.  Sales in the U.S. increased 53% in 2005 as compared to 2004.  (2005 Fage

Annual Report, at 17.)[10]  Although Fage yogurt apparently was first introduced to the U.S.

market in 1998 only in the Northeast, Fage Holdings makes no argument that it was not

distributing Fage yogurt nationwide by the time Fage USA began production in the U.S.

---

[10]     General Mills supports its opposition to Fage's personal jurisdiction
challenge with, in part, Fage's 2010 Annual Report.  Fage's consolidated annual reports
from 2004 through 2011, documents prepared by Fage as required by the SEC, are
available on Fage Greece's website at www.fage.gr.

and purportedly took over U.S. distribution in April 2008. Following the 1998 introduction of Fage yogurt in the U.S., "[a]fter a one year introductory phase, Fage began expanding its business nationwide, through distribution in upscale markets such as Whole Foods and Trader Joe's." (Doc. No. 24, Ex. A-2, at 19 (Fage Greece's TTAB Trial Brief, at 8).)

In terms of the U.S. market, 2005 appears to be a key year. As noted above, Fage's yogurt sales in the U.S. had increased 53% compared to 2004. (2005 Fage Annual Report, at 17.) In February 2005, Fage incorporated Fage USA "to own and operate" the New York production facility it planned to build. (Id. at 15.) By then, Fage's international markets were "primarily in the European Union and the U.S." (Id.) Fage's international "distribution network" consisted of "approximately 150 supermarket chains, with approximately 20,000 retail outlets in 28 countries, primarily throughout Europe and the U.S." (Id. at 25.) By 2005, "Fage products [were] now offered by three major supermarket chains in the U.S." (Id. at 37.) And, in fact, Fage yogurt was on sale in Minnesota at Whole Foods no later than October 2005. (Doc. No. 119, Ex. F (Star Tribune article).)

Fage also concedes that in 2007 Fage Holdings sold yogurt in Minnesota to SuperValu Inc., a Minnesota retailer and wholesaler. (Doc. No. 119, Ex. C (Shea Declaration, ¶ 5)).) Moreover, Fage understood no later than 2009 that one of its major competitors in the yogurt market was General Mills, which has its principal place of business in Minnesota. (2009 Fage Annual Report, at 37 ("Our principal competitors in

the U.S. branded spoonable yogurt market are General Mills, . . . and Groupe Danone.")[11]

And, of course, Fage was aware of General Mills' marks from the proceedings before the

TTAB.

These Minnesota sales were not the product of Fage Holdings simply having cast

the yogurt adrift into some indeterminate stream-of-commerce, however, because Fage

Holdings knew where its yogurt was ultimately available to consumers.  In response to a

July 29, 2004 email asking if Fage had any retailers in the Twin Cities, Fage Holdings's

Secretary, Antonios Maridakis, responded–that same day–by directing the consumer to

Whole Foods.  (Doc. No. 119, Ex. E.)[12]  Moreover, he told the consumer to "recommend

_____

[11]     General Mills relies, in part, on the "Calder effects test" to support
jurisdiction over Fage Holdings.  (Doc. No. 95, at 23.)  In Calder v. Jones, the Supreme
Court approved an effects test to uphold jurisdiction by a California state court over two
Florida defendants who wrote and edited an allegedly libelous story about a California
resident in a national magazine widely distributed in California.  465 U.S. 783, 788-790
(1984).  As the Supreme Court explained, the "allegedly libelous story concerned the
California activities of a California resident." Id. at 788.  Thus, "California is the focal
point both of the story and of the harm suffered." Id. at 789.  The authors were "not
charged with mere untargeted negligence.  Rather, their intentional, and allegedly
tortious, actions were expressly aimed at California." Id.  But this Court need not, and
does not, base its decision solely on Calder v. Jones and the so-called "effects test."
Granted, trademark infringement is an intentional tort.  As the Eighth Circuit explained in
Dakota Industries, Inc. v. Dakota Sportswear, Inc., however, trademark infringement is
not entirely analogous to the intentional tort of libel at issue in Calder.  946 F.2d 1384,
1390-91 (1991).  Although the court relied on Calder in part, it expressly noted that
Calder simply "requires the consideration of additional factors when an intentional tort is
alleged." Id. at 1391.  This Court understands that General Mills is based here in
Minnesota such that the "effects" of any trademark infringement would be felt at least
here, if not also elsewhere.

[12]     General Mills contends that "even a single transaction may be sufficient" in
such circumstances.  (Doc. No. 94, at 18 (citing McGee v. Int'l Life Ins. Co., 355 U.S.
220, 222-24 (1957); Doc. No. 95, at 14 (same).)  But in McGee, the defendant, a Texas
continue...

us to your friends." (Id.)  Similarly, in September 2005, a Twin Cities consumer asked

where "Fage 2%" was available, as Whole Foods "cannot keep it in stock." (Doc. No.

119, Ex. G.)  Likewise, in March 2006, a consumer in Minneapolis inquired whether any

other stores in the area besides Whole Foods carried Fage yogurt. (Id.)  And in February

2006, a consumer in Rochester, Minnesota asked where, if not in Rochester itself, Fage

yogurt could be found. (Id.)  The next day, Katerina Pappas, an employee of Fage

Holdings, emailed back, stating that Fage Total Greek yogurt "can be found at Whole

Foods, Trader Joe's & Wild Oats nationwide." (Id.)  Ms. Pappas also informed the

consumer that nearby stores could be found by contacting Fage's distributor. (Id.)  The

Rochester consumer later responded by stating that Fage yogurt was now available at the

Good Foods grocery in Rochester. (Id.)  These actions would seem to constitute evidence

---

[12]...continue
company, mailed to the plaintiff, a California resident, a reinsurance certificate offering to
insure him in accordance with the terms of the policy plaintiff originally purchased from
an Arizona company, whose obligations the defendant had agreed to assume.  355 U.S.
U.S. at 221-22.  The plaintiff accepted the offer and mailed the premiums to the Texas
defendant.  Id.  The Texas defendant had "never solicited or done any insurance business
in California apart from the policy involved" there.  Id. at 322.  In J. McIntyre Mach., Ltd.
v. Nicastro, however, Justice Breyer, joined by Justice Alito, stated that "[n]one of [the
Court's] precedents finds that a single isolated sale, even if accompanied by the kind of
sales effort indicated here, is sufficient."  131 S. Ct. at 2792 (Breyer, J., concurring in the
judgment).  The plurality implicitly agreed.  Any distinction between McGee and
McIntyre might rest on the fact that McIntyre was a products liability action involving an
independent distributor, whereas McGee concerned an insurance policy mailed directly
by the defendant to the plaintiff's residence in the forum.  But in any event, this Court
need not rely on a "single transaction" theory because it is undisputed that this action
does not stem from a solitary action causing a single discrete injury, but rather from an
ongoing pattern of Defendants' products being sold in Minnesota in substantial quantities
over several years.  Thus, this case also does not implicate Justice Breyer's concerns
about subjecting smaller manufacturers, or manufacturers who sell small quantities of
goods in a particular forum, to personal jurisdiction.  See McIntyre, 131 S. Ct. at 2793.

of purposeful availment of the Minnesota market.

Defendants concede that Fage USA has produced Fage yogurt in the U.S. since April 2008, and also claim that it alone is responsible for U.S. distribution since that date. But Defendants may not claim that Fage USA, although incorporated in February 2005, was responsible for U.S. marketing and distribution before the New York production facility opened in April 2008. Rather, Fage's increasing success in distributing its yogurt in the U.S. up to April 2008 must be attributed at least to Fage Holdings.[13]  Fage's 2007 Annual Report, issued on March 28, 2008–just prior to the start of commercial production of Fage yogurt in New York by Fage USA "early in April 2008"–states that "[t]he primary activity of" Fage Holdings, then still operating under the name Fage USA, Corp., "is the distribution of the Company's products in the U.S."  (2007 Fage Annual Report, at 2, 8.)

Moreover, during the period before Fage USA began operating the New York facility, Fage's international marketing and sales efforts directed at the U.S. market were very significant.  As disclosed in its Annual Reports, Fage Greece monitored its U.S. sales closely and expressly planned on increasing those sales.  At that time, Fage anticipated "that future volume growth will come mainly from growth in its international markets," which are "primarily" in the U.S. as well as the European Union. (2007 Fage Annual Report, at 17.)  Fage's "business strategy" included "plans to further develop its international operations in the U.S." and other foreign markets "and penetrate new and

---

[13]      If not also to Fage Greece.  See infra II.A.2.

expand existing export markets." (Id. at 29.)  "Based on its experience with yoghurt sales

in the U.S. in the past five years, management believes there is significant growth

potential for the Company's yoghurt products in the U.S. market and new manufacturing

capacity is necessary in order to meet current and future demand." (Id. at 30.)  As the

2007 Report observed, "[e]xport sales in the U.S. have grown significantly in recent

years." (Id. at 37.)  And as noted above, Fage personnel were already responding to

Minnesota consumers' questions as to where they could purchase Fage yogurt in

Minnesota as early as 2004.[14]

### (b)    April 2008 To The Present

With respect to Fage Holdings in its current role, that is, after Fage USA began

producing Fage yogurt in April 2008 and allegedly took over U.S. distribution from Fage

Holdings, Fage Holdings appears to be still active in distributing Fage yogurt in the U.S.

Although Fage Holdings now purports to be nothing but a holding company, that is, the

immediate corporate parent of Fage USA, which since early 2008 has owned and

operated the New York production facility, the annual reports suggest that Fage Holdings

is involved in the distribution of yogurt produced by Fage USA.  It appears that Fage

USA is primarily responsible for the operation of the U.S. production facility.  (2008

---

[14]    Fage Holdings would remain liable, of course, for any actionable wrong committed when it operated under its earlier names, Greek Food Imports, Inc. or Fage USA, Corp., in distributing and selling Fage yogurt from 2000 through early 2008.  And with respect to personal jurisdiction, the Court rejects Defendants' argument that specific personal jurisdiction over a non-resident defendant is limited to a defendant's contacts when the action is filed.  See infra note 19 (rejecting Fage Greece's arguments that its distribution of yogurt in the U.S. through Fage Holdings before 2008 can not presently support jurisdiction over it).

Fage Annual Report, at 3 ("The primary activity of [Fage USA] is the *operation* of the Company's yoghurt production facility in the U.S."); 2009 Fage Annual Report, at 2 ("The primary activity of [Fage USA] is the *operation* of the Company's yoghurt production facility in the U.S.").) This is consistent with Fage's intention when it first planned the New York facility. As disclosed by Fage's Annual Report for 2005, the year that Fage USA was incorporated, the "primary activity" of Fage USA "will be the *operation* of the Company's yoghurt production facility in the U.S." (2005 Fage Annual Report, at 2 (emphasis added); accord id. at 15 (stating that Fage USA will "own and operate the yoghurt production facility in the U.S.").)

The annual reports from 2008 through 2010 provide that the role of Fage Holdings, in contrast, remained the *distribution* of the yogurt now produced by Fage USA. (2008 Fage Annual Report, at 2 ("The primary activity of [Fage Holdings] is the *distribution* of the Company's products in the U.S."); 2009 Fage Annual Report, at 2 ("The primary activity of [Fage Holdings] is the *distribution* of the Company's products in the U.S."); 2010 Fage Annual Report, at 2 ("The primary activity of [Fage Holdings] is the *distribution* of the Company's products in the U.S.").)[15]

In light of the Court's analysis with respect to Fage Holding's previous role up through early 2008, however, it is unnecessary to rely solely on Fage Holding's present

---

[15]     Defendants note that Fage Greece's annual report, like those of other parent corporations, "refers to Fage Greece and its subsidiaries collectively as "we," "our" and "The Company." (Doc. No. 110, at 5-6.) As a general matter, the Court agrees. But here, the 2010 Annual Report is not always addressing the activities of the various Fage entities in the aggregate. Rather, it expressly identifies Fage Holdings as the U.S. distributor of Fage Greece's products.

function in deciding Fage Holdings' motion to dismiss for lack of personal jurisdiction. General Mills has met its burden of establishing a prima facie case of personal jurisdiction over Fage Holdings.  Therefore, the Court denies Fage Holdings' motion to dismiss insofar as it is premised on the argument that this Court lacks jurisdiction over it.

### 2.    Fage Greece

With respect to Fage Greece, the question is somewhat different.  Unlike Fage Holdings, Fage Greece, a Greek corporation, never operated as a U.S. corporation importing yogurt for sale throughout the United States.  And unlike Fage USA, Fage Greece never operated as a U.S. corporation producing yogurt in the U.S.  Although Fage Greece manufactured and sold its products in Europe, any sales in the U.S. were conducted in the past by Fage Holdings (as importer of Fage Greece's yogurt) or now by Fage USA (as producer at its New York facility).[16]

### (a)    Alter Ego Theory

General Mills argues that the two U.S. corporations are the mere alter egos of their Greek corporate parent.  (Doc. No. 94, at 32-36.)  In support, General Mills notes that the Fage entities, despite having grown to a large enterprise, are closely-held corporations controlled by the Filippou family.  Even as late as 2011, Fage itself declares that "Fage is wholly owned by Messrs. Ionnis and Kyriakos Filippou (50% each).  By virtue of this share ownership, they *have the ability to control our* management, policies and financing

---

[16]    General Mills again relies, in part, on the "Calder effects test" to support jurisdiction over Fage Greece.  (Doc. No. 94, at 29-32.)  But as explained above, this Court need not, and does not, rely exclusively on that theory.

17

decisions *and to elect all the directors of* FAGE and its *subsidiaries*." (2011 Fage Annual Report, at 10 (emphases added) (previously defining "our" as "FAGE and its consolidated subsidiaries".) But overlapping ownership and the fact that certain individuals may be officers or directors of both Fage Greece and either of the two U.S. Defendants is, on its own, no basis to disregard the corporate separateness of related entities for purposes of personal jurisdiction. <u>Epps v. Stewart Info. Servs. Corp.</u>, 327 F.3d 642, 650 (8th Cir. 2003). Moreover, Fage documents at some length the indicia of corporate separateness of Fage USA and Fage Holdings from Fage Greece. (Doc. No. 110, at 10-11.) And, of course, the fact that Fage Greece includes its subsidiaries' assets and liabilities in its consolidated SEC filings is not enough, on its own, to establish that Fage Greece is present anywhere its subsidiaries are present. <u>Epps v. Stewart Info. Servs. Corp.</u>, 327 F.3d 642, 650 (8th Cir. 2003). On this record, Fage USA and Fage Holdings appear to be viable entities capable of satisfying any judgment General Mills might obtain here.

The Court notes, however, that Fage's 2011 Annual Report informs the investors in the notes Fage Greece issued in 2005, partly to finance the construction of the New York production facility, that they "may have difficulty enforcing [their] rights against us and our directors and officers" because, in part, a "significant portion of *the Group's* assets is located in Greece." (2011 Fage Annual Report, at 13 (emphasis added) (having previously defined the "Group" as Fage Greece and its subsidiaries).) General Mills thus might encounter similar problems satisfying any federal court judgment confined to Fage USA and Fage Holdings.

General Mills also observes, however, that Fage Greece is the sole entity owning the Greek trademarks and that it never produced "in the 11 year-long TTAB proceedings" a copy of the license it alleged existed granting separate entities such as Fage USA the right to sell yogurt under those Greek marks. (Doc. No. 94, at 33.) If Fage Greece were not to have granted a license to its subsidiary, under which the subsidiary would pay its parent royalties for selling yogurt under the Fage Greece mark, that absence could be important evidence that those entities ignored the requirements of maintaining their status as distinct legal entities, with the parent insulated from the liabilities of it subsidiaries.

General Mills also asserts that "[n]otably, subsequent Fage declarants have not mentioned any license." (Id.) Fage Greece's Chairman of the Board, however, declares that "Fage Greece owns the FAGE TOTAL mark for yogurt and licenses Fage USA to use that mark on yogurt products in the U.S." (Doc. No. 78, Ex. C, ¶ 12.) But his declaration, prepared for this litigation in September 2011, neither attached a copy of the license nor addressed when the license was granted. Nor does it address whether that purported license, or a separate license, also permitted Fage Holdings, between 2000 and early 2008, to distribute the yogurt produced by Fage Greece. Fage Greece ignores this issue in Defendants' consolidated reply brief. (Doc. No. 110.) At this point in the proceedings, the Court therefore may not rule out the possibility of disregarding the separate corporate status of Fage USA or Fage Holdings.

### (b)    Fage Greece's Own Actions

More importantly, however, the Court is similarly unable to grant Fage Greece's

motion in light of Fage Greece's own actions and its own contacts with the forum (that is, apart from any veil-piercing analysis). Although it presently appears that the U.S. subsidiaries are separate corporate entities, this hardly precludes any coordinated actions by and between the three separate entities. And as the FAC discloses, General Mills is not premising Fage Greece's liability exclusively on an alter ego theory. Rather, General Mills alleges that "Fage Greece, Fage USA, and Fage US Holdings acted in the capacity of aider, abettor, joint venture, partner, agent, alter ego, controller, licensor/licensee of one another." (Doc. No. 26 (FAC), ¶ 9; accord Doc. No. 125 (Transcript of February 9, 2012 hearing), at 47 (discussing "Fage Greece's direct contacts," "not things that we're attributing to an alter ego theory").)

Fage Greece argues that General Mills improperly relies on a "stream-of-commerce" theory of personal jurisdiction–that is, that Fage Greece (originally via Fage Holdings and now through Fage USA) only placed the yogurt (at first imported from Greece and then produced in New York) into the U.S. stream of commerce without any purposeful effort to direct sales to Minnesota. (Doc. No. 110, at 11-12.) It further contends that General Mills relies on a "'national contacts' approach" that Fage claims "has been directly rejected by the" Supreme Court in J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780 (2011). (Doc. No. 110, at 12.)[17] This Court does not understand General

---

[17]      Despite Defendants' characterization of that theory having been "directly rejected" by the Supreme Court, this Court first observes that Justice Kennedy's plurality opinion in McIntyre commanded only four votes. Justice Breyer, joined by Justice Alito, expressly concurred only in the judgment of no jurisdiction, "not its reasoning," and also expressly disclaimed any need to "go further" beyond the Court's existing precedents by
                                                                                        continue...

Mills' argument to improperly rely on an unduly broad version of the stream-of-commerce theory or on a national-contacts theory, as those theories are properly understood.

### (i) The "Stream of Commerce" Theory

With respect to the stream-of-commerce theory, in <u>J. McIntyre Machinery, Ltd. v. Nicastro</u>, both Justice Kennedy and Justice Breyer rejected an unbounded application of the "stream-of-commerce" theory of personal jurisdiction over non-resident manufacturers. Writing for a plurality, Justice Kennedy stated–with respect to jurisdiction over the English manufacturer–that "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." <u>Id.</u> at 2788 (Kennedy, J., plurality); <u>accord id.</u> 131 S. Ct. at 2792 (Breyer, J. concurring in the judgment). There, however, the plaintiff was injured in New Jersey by a machine manufactured in England by an English corporation, and distributed in the U.S. by an "independent company." 131 S. Ct. 2780, 2786.

Here, in contrast, Fage Greece established Fage Holdings as a U.S. corporation for the express purpose of distributing Fage Greece's yogurt in the U.S. And General Mills is not contending that Fage Greece simply produced its yogurt in Greece and sold it to a distributor merely with the knowledge that some of the yogurt might end up in

---

[17]...continue
agreeing with the plurality's proposed new "strict rules." 131 S. Ct. at 2794.

Minnesota.[18]

Despite Justice Kennedy and Justice Breyer's concerns regarding the excesses of the stream-of-commerce theory as applied by some lower courts, neither proposed overruling the Supreme Court's own precedents. Under those decisions, a non-resident manufacturer may not always insulate itself from personal jurisdiction simply by having another entity conduct its distribution and sales in the forum. "[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly the market for its product in other States it is not unreasonable to subject it to suit in one of those States if its [product] has there been the source of injury to" others. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

At this juncture of the proceedings, the record here suggests that Fage Greece (as

---

[18]    The facts here are also plainly distinguishable from those at issue in Falkirk Mining Co. v. Japan Steel Works, Limited, 906 F.2d 369 (8th Cir. 1990), on which Defendants rely in part for their "stream-of-commerce" argument. In Falkirk, the plaintiff's parent corporation, an Ohio corporation, entered into a contract with a Delaware corporation for the purchase and construction of a particular type of mining crane. Id. at 371. The Delaware corporation agreed to purchase some cams needed for the crane from the American subsidiary of a Japanese company, which then contracted with a Japanese corporation to manufacture the cams. After the crane failed in North Dakota, the plaintiff brought suit against that Japanese manufacturer and its American subsidiary. The Eighth Circuit held that neither defendant had purposefully availed itself of the laws and protections of North Dakota, noting that the fact that the Delaware corporation's incorporation of the cam into the crane in North Dakota did not subject the defendants to jurisdiction in North Dakota because the defendant's contractual obligation was with the other Japanese company and its American subsidiary, not with the plaintiff. Id. at 375. Moreover, the defendants had no other contacts with the forum, because the Delaware corporation was the entity that brought the cams "it purchased from" defendants into North Dakota. Id. at 375-76.

well as Fage Holdings) consistently engaged in various "efforts" to sell Fage yogurt

throughout the U.S.  Although Fage claims that its yogurt was initially distributed only in

the Northeast, beginning in 1999, there is no contention that by 2007 U.S. distribution did

not include Minnesota.  As the 2007 Annual Report states, "[b]eginning in 1999, the

Company began distributing yoghurt to the U.S. market and FAGE products are now

offered by three major supermarket chains in the U.S." (Id. at 39.)  And, of course, the

fact that a defendant directs its sales throughout the U.S. does not mean that it did not

target a particular forum in the U.S.  Rather, any continuous, purposeful, nationwide

marketing and distribution which targeted the United States presumably would support

personal jurisdiction in any and every State towards which a defendant directed sales.

"The forum State does not exceed its powers under the Due Process Clause if it asserts

personal jurisdiction over a corporation that delivers its products into the stream of

commerce with the expectation that they will be purchased by consumers in the forum

State." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. at 297-98.

Granted, as Justice Breyer observed in McIntyre, the fact that sales of a product

manufactured by a non-resident occur in the forum is not enough, "even if that defendant

places his goods in the stream of commerce, fully aware (and hoping) that such a sale will

take place." Id. at 2792 (Breyer, J., concurring in the judgment).  Rather, "'something

more'" is required, "such as special state-related design, advertising, advice, marketing,

or anything else." Id.

Here, it appears that some of that additional evidence might exist, and, more

importantly, that Fage Greece itself was involved.  Fage employed an extensive sales and

marketing force.  During 2006, for example, over a quarter of Fage's employees (316 of

1,196) were devoted to "selling and distribution."  (2006 Annual Report, at 41.)

Moreover, Fage's marketing and advertising efforts expressly targeted the U.S., and

specifically Minnesota:

> We also distribute certain of our products internationally to approximately
> 220 supermarket chains, with approximately 30,000 retail outlets in 29
> countries, primarily throughout Europe and the U.S.  *Our U.S. distribution
> network serves some of the largest U.S. retailers,* such as Wal-Mart Stores,
> Inc., . . ., Costco Wholesale Corp., . . ., SUPERVALU Inc. . . . Whole Foods
> Market Inc., . . . Trader Joe's, [and] Super Target, . . . .

(2011 Fage Annual Report, at 31 (emphasis added).)  SUPERVALU Inc. has its principal

place of business in Minnesota.[19]

_____

[19]     It further argues that its actions in the past may not support specific
personal jurisdiction over it now.  (Doc. No. 110, at 12 ("That Fage Greece *formerly*
manufactured FAGE TOTAL yogurt that was imported . . . to the United States is not a
basis for subjecting it to . . . jurisdiction in Minnesota in 2011").)  The Court disagrees.
Otherwise, any defendant could defeat personal jurisdiction simply by ceasing–even
temporarily–any ongoing activity just prior to the commencement of the action.  And with
respect to claims premised on discrete activities (much less a single action), each of which
rapidly concludes, Defendants' argument might unjustifiably preclude personal
jurisdiction altogether.  Defendants mistakenly focus not on when the claims arose, but on
when this action was filed.  Data-Stream AS/RS Tech., LLC v. Acequip Ltd., on which
Defendants rely, addressed only whether a corporation was "doing business" within the
forum.  2002 WL 1683736 (S.D.N.Y. 2002).  As that court explained, a corporation
"doing business" within the forum is a basis for *general* personal jurisdiction because it
amounts to the corporation being present in the forum.  Id.  Luckett v. Bethlehem Steel
Corp., on which Defendants also rely, is likewise distinguishable as the court ruled that
the defendant was not subject to jurisdiction where the cause of action arose after the
defendant's "'presence'" ended.  618 F.2d 1373, 1387 (10th Cir. 1980).  If an entity is no
longer "doing business" in the forum, then it is, of course, no longer present in the forum.
"'Doing business' cases should not be confused with 'transacting business' cases," which,
unlike "doing business" cases, involve a form of long-arm jurisdiction over non-resident
continue...

Nonetheless, with respect to sales and marketing in the U.S., Fage Greece attempts to separate itself from the actions of its U.S. subsidiaries, noting that an annual report may disclose the financial results of a corporate group in the aggregate. (Doc. No. 77, at 5-9.) Thus Fage Greece contends that the U.S. sales identified in those reports are now solely the results of Fage USA's efforts (and formerly of Fage Holdings' efforts).

Of course, each individual "defendant's contacts with the forum State must be assessed individually." Calder v. Jones, 465 U.S. 783, 790 (1984). And a parent corporation is generally a separate entity from any subsidiary corporation despite its ownership of the subsidiary. United States v. Bestfoods, 524 U.S. 51, 61 (1998). Moreover, for purposes of personal jurisdiction, the actions and contacts of a subsidiary may not be attributed to its parent unless the corporate veil may be pierced. Epps v. Stewart Information Servs. Corp., 327 F.3d 642, 648-49 (8th Cir. 2003).

But here, where appropriate, the annual reports disclose financial results of only particular Fage entities. (2011 Fage Annual Report, at 21 (providing breakdown of sales, profits and losses of "FAGE DAIRY INDUSTRY S.A. only").) And the annual reports do more than disclose consolidated financial results. They also discuss business strategies and marketing efforts.

---

[19]...continue
defendants, whereas "doing business" constitutes corporate "presence." 4A Wright & Miller, Federal Practice and Procedure § 1069.2 (3d ed. 2002). Here, as noted above, General Mills disavows any attempt at establishing general personal jurisdiction as it is plain that none of the Fage entities has such "continuous and systematic" contacts as to be deemed present in Minnesota. The question remains whether this Court has specific personal jurisdiction over Fage Holdings and Fage Greece as non-residents of Minnesota.

And if the parent is itself engaging in sales and marketing activities *along with* its subsidiary distributor or manufacturer, the Court is not improperly attributing the subsidiary's actions to the parent. Rather, the Court is assessing Fage Greece's own actions, albeit those perhaps conducted often in conjunction with its subsidiaries.

In May 2007, for instance, Ioannis Papageorgiou, the International Business Director at Fage Greece, "enthusiastic[ally]" approved an advertising budget in excess of $2 million proposed by the agency that included $660,000 for print media. (Doc. No. 119, Ex. I.) With respect to public relations, the initiative Fage Greece approved ("thumbs up") involved an article that would be published in Forbes magazine and the Wall Street Journal. (Id.) The agency submitted a draft of a Q&A, based on the 2006 annual report and a conversation with a Fage officer–Ioannis Papageourgiou, the President and COO of Fage USA as well as of Fage Holdings. The draft noted that "[r]evenues in the US market are consistently on the rise" and that "[f]or the first 6 months of 2007 – US sales have been increasing in volume terms by 62.5% year to year – and we expect that pace to continue." (Id.) The draft also stated that "[t]he marketing decisions made by FAGE are very deliberate." (Id.) "[T]he business" was described as being run by "three members of the third generation of the Filippou family," noting that Athanassios Filippou is the CEO of "the company." At the time, he also was Vice Chairman and CEO of Fage USA as well as of Fage Holdings. In the proposed Q&A, Fage noted that "managing the international shipping logistics" of its yogurt was a "complicated logistical operation," an "area of distinct expertise." (Id.) Unlike a durable

26

good such as a metal-sharing machine that may be moved in interstate commerce by a U.S. distributor (much less an inherently mobile good such as a car), yogurt is a perishable foodstuff with a limited life. Distribution thus presumably must be focused more directly towards the ultimate consumer.

In sum, there is evidence in the present record that this may not be a case where a foreign manufacturer simply produced its product overseas and turned over its distribution to an independent intermediary such that the manufacturer could plausibly claim that it did not purposefully target a particular forum. Unlike the "independent company" retained to distribute J. McIntyre's machines, Fage Holdings was apparently established for the express purpose of distributing Fage Greece's yogurt in the U.S., and the express purpose of Fage USA was to produce–purportedly under license–Fage Greece's yogurt in the U.S. so as to not have to import it from Fage Greece. Accordingly, this is not a case where the foreign manufacturer simply "'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" McIntyre, 131 S. Ct. at 2793 (Breyer, J., concurring in the judgment).

Rather, on the present record it appears that it might be a case where the foreign defendant in fact knows that its product is distributed nationwide in the U.S. such that those products are sold in presumably all of the States, but indisputably here in the forum. Fage Greece did not employ an "independent company" to distribute Fage yogurt outside of Greece. Nor did it simply sell its yogurt to a distributor without any interest in,

knowledge of, or control over, where the distributor sold the yogurt to the retailers. Rather, Fage Greece first established a wholly-owned subsidiary for the express purpose of distributing its yogurt in the U.S., a market that was growing rapidly in contrast to Fage domestic Greek sales. Fage Greece then created a subsidiary of its direct subsidiary to produce Fage yogurt in the U.S. for the growing U.S. market. Moreover, the Fage entities employed an international "sales and marketing" strategy that involved direct relationships with the retailers, which by 2007 included three major U.S. supermarket chains.

### (ii)    The Purported "National Contacts" Theory

With respect to the "national contacts" theory, Fage apparently misunderstands this concept to refer to a situation where a foreign defendant purposefully directs its sales to the U.S. nationwide, that is, throughout each of the States. Such purposeful nationwide sales and distribution must be distinguished from a foreign defendant whose U.S. contacts are diffuse, such that no single State could have jurisdiction, but are sufficient to support jurisdiction when considered in the aggregate, that is, on a "national" basis. As Justice Kennedy explained, "a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State." McIntyre, 131 S. Ct. at 2789 (Kennedy, J., plurality). In other words, "[f]or jurisdiction, a litigant may have the requisite relations with the United States Government but not with the government of any individual State." Id.

Here, in contrast, General Mills is not relying on a "national contacts" theory–that

is, that Fage Greece directed sales to the U.S. but without directing sales to Minnesota or any other State sufficient for any individual State to assert jurisdiction. Rather, General Mills asserts that its claims "arise out of Fage Greece's contacts with the forum state–namely, its advertisement, distribution, and sales of infringing products in Minnesota and throughout the United States." (Doc. No. 94, at 19.)

### (c)    Conclusion

Fage Greece created Fage Holdings as a domestic (New York) corporate subsidiary for the express purpose of distributing Fage yogurt in the U.S. and that distribution apparently was nationwide by no later than 2007. And unlike the machines at issue in McIntyre, which apparently were sold in small numbers, the Fage yogurt in question here is an individual consumer product sold in vast quantities. This is not the case where, according to the example provided by Justice Breyer, an Appalachian potter sells his cups and saucers "exclusively to a large distributor, who resells a single" coffee mug to a buyer in Hawaii. 131 S. Ct. at 2793.

In sum, at this juncture, the Court is unable to conclude that it lacks personal jurisdiction over Fage Greece. Although the three Fage entities appear at this point to be separate legal entities, there remains the question of whether Fage Greece properly licensed it Greek trademarks to either of its subsidiaries. But more importantly, Fage Greece appears to have acted in concert with its subsidiaries in purposefully marketing and selling Fage yogurt throughout the U.S., including Minnesota.

The Court thus denies Fage Greece's motion to dismiss without prejudice. On the

present record, General Mills satisfies the standard for jurisdictional discovery. A party may obtain jurisdictional discovery if it possesses some "documentary evidence, and not merely speculations or conclusory allegations," about the other party's contacts with the forum state. Steinbuch v. Cutler, 518 F.3d 580, 589 (8th Cir. 2008). Such documentary evidence need not rise to the level of "sufficient proof for a prima facie case of" jurisdiction over the other party. Id. (permitting discovery while expressly clarifying that plaintiff had not yet "adduced sufficient proof for a prima facie case of general jurisdiction").[20] Fage Greece may renew its jurisdictional argument after limited discovery on this issue.

###    B.    Alter-Ego Liability

General Mills' First Amended Complaint added what it denominates as an additional claim for alter ego liability. (Doc. No. 26, ¶¶ 73-80.) Fage Greece moves to dismiss the First Amended Complaint on the grounds that it is a separate corporate entity from Fage USA and Fage Holdings. (Doc. No. 48, at 14-17.)

The Court first observes that alter ego liability is not a separate cause of action but

---

[20]    The Court recognizes, of course, that on January 23, 2011, Magistrate Judge Keyes denied much of General Mills' earlier request for jurisdictional discovery. (Doc. No. 111, Ex. A; Doc. No. 113.) But much of the previously-requested discovery was focused on General Mills' efforts to pierce the separate entity status of the two U.S. subsidiary corporations. (Doc. No. 111-1, at 25-26 (denying, in oral ruling, the alter-ego discovery General Mills sought.) Fage's counsel agrees that in the motion before Judge Keyes, General Mills "primarily relied on the alter ego theory," and that although other theories were raised in "the end it largely boiled down to the" alter ego theory. (Doc. No. 125, at 12.) Here, on the more substantial record of a Rule 12 motion supported by extensive briefing and numerous affidavits and declarations, this Court determines that additional jurisdictional discovery–not confined to the issue of corporate veil-piercing–is warranted.

rather a theory for holding liable the owner(s) of a corporation for the corporation's wrongful conduct.  In any event, as discussed above with respect to personal jurisdiction, there remains a question as to whether Fage Greece ever licensed its trademarks to any of its subsidiaries or otherwise failed to respect the boundaries of separate entities.  The Court recognizes that the requirements for disregarding the separate-entity status of related corporations are demanding.  Moreover, as discussed above, General Mills' reliance on such facts as the overlapping nature of the boards of the various entities is inadequate to establish alter ego liability.  But until such issues as the inter-entity licensing of Fage Greece's marks are resolved, the Court may not dismiss the alter ego "claim" on a Rule 12 motion.

### C.      Failure To State A Claim

Defendants also move to dismiss certain of General Mills' claims on various other grounds.

#### 1.      Dismissal Standard

The Court accepts as true the factual allegations of the Complaint and draws all reasonable inferences in Plaintiffs' favor, but does not defer to any legal conclusions or formulaic recitations of the claims' elements.  Minneapolis Firefighter Relief Ass'n v. MEMC Electronic Materials, Inc., 641 F.3d 1023, 1027 (8th Cir. 2011).  Under Rule 12(b)(6), the Complaint "'must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009)).

31

2.   **Trademark Dilution**

Defendants move to dismiss General Mills' claims for trademark dilution under federal and state law for failure to state a claim. Defendants first contend that General Mills "must plead factual allegations sufficient to show 'dilution by blurring.'" (Doc. No. 48 at 11.) In short, they argue General Mills must "allege that the unauthorized use of [their] allegedly famous mark has caused their mark to become vague and less distinctive," but that their allegations are "improperly based on claims of a 'likelihood' of *confusion* and formulaic recitations that consumers have been 'deceived or confused as to the origin, association, connection or sponsorship' of Fage Total products." (Id. at 12.)

A claim for infringement, which depends on the likelihood of confusion, is "separate and distinct from" a claim for dilution, which "concerns 'the lessening of the capacity of a famous mark to identify and distinguish goods or services.'" Luigino's Inc. v. Stouffer Corp., 170 F.3d 827, 832 (8th Cir. 1999) (quoting 15 U.S.C. § 1127). But here, the FAC indisputably denominates separate claims for trademark infringement and for trademark dilution and the dilution claim alleges that "Fage's unauthorized use of the TOTAL Mark in connection with its yogurt product is likely to cause dilution by blurring of the TOTAL Mark," which General Mills has used since 1961. (Doc. No. 26, ¶¶ 42-46, 53-57, 55.) Thus, there is no plausible argument that Defendants are confronted with a single generic claim for "violation of trademark law" and are unable to discern whether it is an infringement or a dilution claim.

Nor can the Court conclude that General Mills failed to state a claim for trademark

dilution.  In <u>Planet Coffee Roasters, Inc. v. Dam</u>, on which Defendants rely, the court

dismissed a dilution claim because the plaintiff, who operated a business roasting coffee,

but did not hold a federally registered trademark, did not allege sufficient facts to show

that its mark was nationally famous or that defendant's use of the mark presented a

likelihood of dilution of the distinctive value of plaintiff's famous mark.  2009 WL

2486457, *3.  Here, in contrast, the FAC alleges that General Mills, "one of the largest

food manufacturers in the world" that has "built some of the best-known brands in the

country," has "continuously marketed ready-to-eat cereal under" its federally registered

and incontestable "TOTAL" marks, which have been "famous" "by any measure," since

1961.  (Doc. No. 26, ¶¶ 16-20.)  The FAC also included images of General Mills' Total

brand of cereal as well as Defendants' Total brand of yogurt.  The FAC thus also does not

consist only of, as Defendants contend, mere "labels and conclusions" or a "formulaic

recitation of the elements of a cause of action."  Rather, it states a claim that Fage, by

selling its "Total" yogurt in stores that likely also sell General Mills' "Total" cereal, has

likely decreased the ability of General Mills' famous mark to identify and distinguish its

"Total" brand of cereal.

　　　　Defendants also contend that General Mills' request for damages under 15 U.S.C.

§ 1117 may not be based on federal trademark dilution because under 15 U.S.C. §

1125(c)(5)(A), the owner of a famous mark is entitled to damages under Section 1117

only if "'the mark . . . that is likely to cause dilution by blurring . . . was *first used* in

commerce by the person against whom the injunction is sought *after October 6, 2006.*'"

(Doc. No. 48, at 13.)  But a motion to dismiss based on this argument is premature.  The Court will address whatever relief General Mills might be entitled to at the appropriate juncture.  Accordingly, the Court denies Fage's motion to dismiss the dilution claims, although without prejudice to Fage's argument regarding the appropriate relief on the federal claim.

### D.   Laches and Limitations Period

Defendants move to dismiss the three state law claims as well as the federal claim for trademark dilution as untimely, or at least limited to acts that occurred within the statutory periods, arguing that, on its face, the FAC reveals that all such claims accrued years before the start of the applicable limitation periods.  (Doc. No. 48, at 17-18.)  Noting that the FAC alleges that Fage Greece "entered the U.S. market in 1998," and that General Mills filed Notices of Opposition against Fage Greece's federal trademark application for Fage Total yogurt in June 2000, Defendants contend that the filing of the original Complaint on September 16, 2011 was too late in light of the six-year period applicable to the state-law claims and the four-year period governing the federal dilution claim.  (Id. at 18-20.)

"Bar by a statute of limitations is typically an affirmative defense, which the defendant must plead and prove."  Jessie v. Potter, 516 F.3d 709, 713 n.2 (8th Cir. 2008).  And "[a] defendant does not render a complaint defective by pleading an affirmative defense."  Id.  Accordingly, dismissal under Rule 12(b)(6) on such grounds is ordinarily not permissible "unless the complaint itself establishes the defense."  Id.  General Mills

argues that the existence of factual disputes regarding Fage's affirmative defenses preclude resolution of its limitations defense at this juncture. (Doc. No. 95, at 28.) It further contends that the FAC "does not contain facts relating to General Mills' knowledge of Fage's *use* of 'Total' at any time certain, much less facts sufficient to establish when any of the pleaded claims accrued." (Id. at 29 (emphasis in original).) In particular, General Mills asserts that Paragraph 25 of the FAC, on which Fage relies, "merely states that Fage Greece entered the U.S. market in 1998, not that Plaintiffs were aware of this fact at any particular time relevant to a statute of limitations defense," and that "Paragraph 29 simply confirms that General Mills filed Notices of Opposition to Fage Greece's trademark applications, and thus was aware of the *applications* at this time, not aware of any use, and certainly not aware of the accrual of any claim." (Id. (emphasis in original).)

Fage disputes this point, stating that "Plaintiffs' counsel know well from the TTAB factual record that Plaintiffs have long been aware of the sale of FAGE TOTAL products in the United States and cannot suggest otherwise to this Court." (Doc. No. 110, at 19.) Fage provides no factual support, however, for this assertion. This dispute is hardly properly addressed on a Rule 12 motion where Fage's affirmative defense must be clearly established by the Complaint.

With respect to General Mills' federal dilution claim, Fage contends that "[a]lthough Plaintiffs opposed *registration* of the marks at issue, Plaintiffs took no action to enjoin Defendants' *use* of the FAGE TOTAL marks in commerce" for twelve years.

(Doc. No. 48, at 20.)  Fage suggests that General Mills' federal dilution claim arose in 1998 because the FAC alleges that "Fage entered the U.S. market in 1998," when Fage first began distributing its yogurt.  (Id. (quoting FAC, ¶ 25).)  But as the FAC also alleges, "[f]or a number of years, the distribution of these Greek products was mostly limited to Greek specialty stores located in only a handful of urban areas in the Northeast."  (Doc. No. 26 (FAC), ¶ 25.)  As discussed above, a claim for dilution concerns the lessening of the capacity of a famous mark to identify and distinguish goods or services.  It is far from clear, based on the Complaint alone, that General Mills' dilution claim arose in 1998 when Fage was distributing its yogurt in much smaller quantities in only a limited segment of the U.S. market.

In any event, it is not even clear that dilution claims are subject to any statute of limitations.  "The Lanham Act does not contain a statute of limitations."  Axcan Scandipharm Inc. v. Ethex Corp., 585 F. Supp. 2d 1067, 1077 (D. Minn. 2007).  Fage, however, contends that the four-year "catch-all" limitations period of 28 U.S.C. § 1658 applies to the federal dilution claim.  Under that statute, "a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues."  28 U.S.C. § 1658(a).

But because Lanham Act claims are equitable, rather than legal, they are subject to the equitable doctrine of laches rather than statutory limitations periods.  Ford Motor Co. v. Catalanotte, 342 F.3d 543, 550 (6th Cir. 2003) (observing that with respect to Lanham Act claims, "'courts have consistently used principles of laches as developed by courts of

equity,'" rather than statutes of limitations).  Fage cites <u>McCarthy on Trademarks and Unfair Competition</u>, but that treatise makes clear that while "the FTDA became effective January 16, 1996 and was substantially revised 10 years later," a "statute of limitations is often used as a benchmark to measure the defense of estoppel by laches." 4 J. Thomas McCarthy, <u>McCarthy on Trademarks and Unfair Competition</u> § 24:130 (proceeding to then discuss laches).  But evaluating a laches defense involves much more than simply plugging in a limitations period applicable to an analogous claim.  <u>Catalanotte</u>, 342 F.3d at 550.  And as that treatise also makes clear, that defense turns on issues not amenable to resolution on a Rule 12 motion just by reference to the Complaint:

> Defendant's proof in its laches defense must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time. Obviously, whether the claim is sufficient to bar relief, "depends upon a consideration of the circumstances of each particular case and a balancing of the interests and equities of the parties."

6 <u>McCarthy on Trademarks</u> § 31:1 (quotation omitted).

Fage notes that some district courts have applied the statute of limitations defense to Lanham Act claims.  But in <u>Axcan Scandipharm Inc. v. Ethex Corp.</u>, the court did so—after recognizing that such claims might be subject only to the equitable defense of laches—only because all of the parties there agreed that the Lanham Act claims "are subject to a statute of limitations." 585 F. Supp. 2d at 1077 n.12.  Fage's reliance on <u>Fox Chem. Co. v. Amsoil, Inc.</u>, is likewise untenable as there too both parties advocated a particular statutory limitations period. 445 F. Supp. 1355, 1357 (D. Minn. 1978).

Finally, Fage–citing the Supreme Court's decision in <u>Jones v. R.R. Donnelley & Sons</u> <u>Co.</u>–argues that "[c]ourts" have "recognized that because a federal dilution claim is brought under the Trademark Dilution Revision Act of 2006, . . . ., such claims are also subject to the statute of limitations." (Doc. No. 110, at 19.)  But <u>Jones</u> was an employment discrimination action and in no way addressed trademark dilution claims. 541 U.S. 369 (2004).

Finally, General Mills also asserts tolling and continuing wrong arguments.  But the Court need not address such issues now, as it is clear that General Mills' trademark dilution claim is not subject to a statutory limitations period, but rather laches, and that a Rule 12 motion is not the time to resolve such issues.[21]

### E.   Scope of Injunctive Relief

Defendants also move to dismiss what they characterize as General Mills' overly broad request for injunctive relief, arguing that General Mills seeks such relief with respect to not only yogurt but also other dairy products. (Doc. No. 48, at 20.)  In particular, Defendants assert that they possess an incontestable U.S. registration of the Fage Total mark for feta cheese and that General Mills has not appealed the TTAB's holding that the mark for Fage Total for tzatziki is entitled to registration.  (<u>Id.</u>)

General Mills contends that even an incontestable registration is subject to

---

[21]    Apart from its initial argument that state statutory and common law claims are subject to a six-year limitations period, Fage provides no further discussion of, and no authority for, its position that the particular state-law claims at issue here are legal, and therefore governed by any statutory limitations period, rather than equitable, and therefore subject instead to laches.  Accordingly, the Court will not dismiss the state-law claims on a Rule 12 motion.

challenge and to cancellation on various grounds such as abandonment. (Doc. No. 95, at

33.) General Mills notes that it has filed a petition to cancel the registration for the feta

cheese mark, arguing that "Fage appears no long to be using the registered mark." (Id.)

With respect to Fage's mark for tzatziki, General Mills contends that the TTAB, although

not denying registration of Fage's mark in one class that does not include dairy products,

did refuse registration of the mark in another class that does include dairy products, in

particular, yogurt.  On the present record, the Court denies Defendants' motion to

preclude injunctive relief at this early juncture of the proceedings.

### F.       The Proper Forum

Finally, Fage Greece has moved to transfer this action to the Northern District of

New York, where Fage Greece has pursued its appeal of the TTAB decision, or, in the

alternative, to stay this action pending the outcome of the New York appeal. (Doc. No.

101.) General Mills not only opposes that motion, but moves to enjoin Defendants from

proceeding with the New York appeal. (Doc. No. 80.)

### 1.       Enjoining Defendants From Proceeding With Their New York Action

In seeking to halt the New York action, General Mills relies on the "first-filed

rule," noting that its action here was filed two weeks before Fage filed its "appeal" in the

Northern District of New York and that nothing here warrants deviation from that rule.

Under that rule, there is a general presumption that the forum in which jurisdiction first

attaches should hear the dispute(s) rather than another court where a similar action is later

filed. Orthmann v. Apple River Campground, Inc., 765 F.2d 119, 121 (8th Cir. 1985).

But the "rule" is a flexible one, not intended to be rigid, mechanical or inflexible. Northwest Airlines, Inc. v. American Airlines, Inc., 989 F.2d 1002, 1005 (8th Cir. 1993). The issue is for this Court's discretion, based on the particular facts presented here. See Boatman's First Nat'l Bank of Kansas City v. Kan. Pub. Employees Ret. Sys., 57 F.3d 638, 641 (8th Cir. 1995).

In response, Fage notes the outstanding jurisdictional question with respect to Fage Greece and also contends that its appeal of the TTAB decision may proceed only in New York because the parties' stipulated protective order in the TTAB proceedings precludes any use of the record of those proceedings outside of an appeal. Fage further argues that the "claims in the New York Action are broader than those before this Court." (Doc. No. 102, at 10.) Moreover, Fage contends that "the multiple errors of fact and law that permeate the [TTAB] decision must be resolved by way of Fage Greece's appeal prior to [General Mills'] planned use of the decision as a sword in their infringement case." (Id. at 11.) Fage asserts that while the TTAB appeal implicates the registrability of certain marks, the issue here is infringement. (Id.) Fage thus requests a transfer of this action under Section 1404(a), contending that all relevant factors favor the New York forum. (Id. at 17-18.)

At the hearing on this matter, General Mills conceded that the first-filed rule does not apply if this Court would not have personal jurisdiction over Fage Greece. (Doc. No. 125, at 64.) Absent a conclusive finding of such jurisdiction, the Court will not enjoin Fage Greece from proceeding in its chosen forum. See Falkirk Mining Co. v. Japan Steel

Works, Ltd., 906 F.2d 369, 372 (8th Cir. 1990) ("Before a district court can reach the

merits of a dispute and enter legally binding orders, it must determine as a threshold

matter whether it possesses personal jurisdiction over the defendants.").

      Moreover, the facts here do not present a simple question of whether the dispute

should be resolved here or in New York.  It is not entirely clear that the two actions are

mirror images of each other, in terms of either the issues or the parties.  Unlike the

circumstances commonly encountered under the first-filed rule, in which one party is the

"natural" plaintiff but the other files first, usually seeking only declaratory and/or

injunctive relief, here each side has a plausible affirmative claim for relief.  Granted, Fage

USA joins its corporate parent in the New York action, seeking declaratory relief that

Fage's yogurt does not infringe General Mills' Total mark, but a declaratory judgment

action is a red flag under the first-filed rule usually only where that action is filed first.

And Fage Greece is entitled to the option of appealing the TTAB's decision in a federal

district court in lieu of a traditional appeal to the Court of Appeals for the Federal Circuit.

15 U.S.C. § 1071.  In addition, it is not entirely clear that the issue on appeal from the

TTAB proceedings, that is, whether Fage was entitled to registration of the marks it

sought, is precisely the same as whether Defendants infringed General Mills' marks.

      In the present action, in contrast to that in New York, General Mills seeks relief

not only from Fage Greece and Fage USA, but also from Fage Holdings.  Moreover,

General Mills asserts claims under Minnesota law as well as federal law, while the New

York proceedings are confined, at least at present, to issues of federal trademark law.[22]

Accordingly, the Court will deny General Mills' present motion to enjoin Defendants

from proceeding with the New York action and leave it within the wise discretion of the

New York court whether to stay its action pending resolution of this matter.

### 2.   Transfer

The Court denies Fage's motion to transfer this action to New York.  Plaintiffs

here timely commenced the present action in the forum of their choice, and did so before

Fage elected to pursue its "appeal" in the New York district court.  The facts here do not

reveal that one forum is plainly more convenient than the other.  Under Section 1404(a),

this Court "may transfer" this action to the Northern District of New York, assuming that

it "might have been brought" there in the first instance, "[f]or the convenience of parties

and witnesses, [and] in the interest of justice." 28 U.S.C. § 1404(a).  It is beyond dispute

that "federal courts give considerable deference to a plaintiff's choice of forum and thus

the party seeking a transfer under section 1404(a) typically bears the burden of proving

that a transfer is warranted." Terra Int'l, Inc. v. Mississippi Chemical Corp., 119 F.3d

688, 695 (8th Cir. 1997) (emphasis added).  This principle is often applied in Lanham Act

cases to deny transfer motions where the plaintiff has filed suit in its home forum,

particularly where, as here, the plaintiff also alleges claims based on the law of the forum

state.  E.g. Broadcast Marketing Int'l, Ltd. v. Prosource Sales & Marketing, Inc., 345 F.

---

[22]    Although General Mills argued to the New York court that Fage's appeal
could have and should have been filed here as a compulsory counterclaim, and that that
issue would be for this Court to decide, the parties do not press that argument here.

42

Supp. 2d 1053, 1064 (D. Conn. 2004) (denying transfer motion where plaintiff resided in

forum, products at issue were sold in forum and forum court was "better equipped to deal

with the law governing" claims based on forum state law); see Hueblein, Inc. v. Walker,

936 F. Supp. 177, 186 (D. Del. 1996) (addressing "'home turf'" rule, which recognizes

deference owed to plaintiff's choice of filing suit in district where it is principally

located).  To carry its burden, Fage USA "must show that [its] inconvenience '*strongly*'

outweighs the inconvenience plaintiffs would suffer if venue were" transferred.  Nelson v.

Bekins Van Lines Co., 747 F. Supp. 532, 535 (D. Minn. 1990) (emphasis in original)

(internal citations omitted).

      Neither party has identified any genuine issue implicating "the interest of justice"

that would weigh decisively in favor of one forum or another.  The Eighth Circuit has

identified the following factors as implicating the interests of justice:  (1) judicial

economy, (2) the plaintiff's choice of forum, (3) the comparative costs of litigating in

each forum, (4) each party's ability to enforce a judgment, (5) obstacles to a fair trial, (6)

conflict of law issues, and (7) the advantages of having a local court determine question

of local law.  Terra Int'l, Inc., 119 F.3d at 696.  Although judicial economy would be

served by having the two actions consolidated before a single court, this factor

presumably weighs as much in favor of transferring the New York action here as it does

in favor of transferring this action to New York.  And while the Court genuinely values

judicial economy, it is wary of imposing the most economical solution at the risk of

compromising any of the parties' rights.  With respect to the remaining factors, they

weigh, if at all, somewhat in favor of retaining this action here insofar as General Mills chose the present forum and this Court might have some advantage over a New York court in adjudicating General Mills' claims under Minnesota law.

With respect to the convenience factors relevant to transfer, the Court concludes it is roughly a wash between the two competing forums. The Court first observes that all of the parties are sophisticated business corporations, not individuals who might genuinely incur undue inconvenience in having to litigate far from home. Although Fage asserts that it would be more convenient for any of its Greek personnel to have to travel only to New York, that argument might have some weight had the New York action been venued in New York City rather than in Northern District of New York. Granted, Fage filed its action in the district in which Fage USA is located. But "[t]he mere fact that many or all of a defendant's witnesses and corporate documents reside in the transferee forum does not by itself justify a transfer." Hueblein, Inc. v. Walker, 936 F. Supp. 177, 189 (D. Del. 1996) (addressing Lanham Act claims). And General Mills, while conceding it has a manufacturing facility in Buffalo, prefers to litigate this action here where it has its principal place of business, further asserting that none of its witnesses would be located near its Buffalo facility, which in any event lies in the Western District of New York. (Doc. No. 115, at 22.)

Likewise, the evidence is not decidedly more "fixed" in one forum rather than another. Although Fage contends that "the New York court [has] the advantage of access to the TTAB record," the New York court has access to the TTAB record only because

Fage Greece elected to pursue its "appeal" there rather than any other federal district court.  In sum, General Mills would likely be inconvenienced in litigating this action in New York as much as Fage would be in litigating its action here.  This Court will not grant a motion to transfer where the result is simply to shift the inconvenience from one party to another.  Janel Russell Designs, Inc. v. Mendelson & Assocs., Inc., 114 F. Supp. 2d 856, 862 (D. Minn. 2000).

The Court recognizes, of course, that the denial of both parties' motions results in two district courts proceeding with actions that present a significant but not complete overlap of issues and that any final decisions issued by either court might impact the proceedings in the other.  This Court, unlike that in the Northern District of New York, will not be reviewing the TTAB's decision.  But this does not mean that judicial resources will be unduly wasted.  At present, the Court need only concern itself with pre-trial proceedings.  Trial of the various disputes, if such becomes necessary, is a separate question that this Court need not resolve now.  Thus, the Court concludes that the present action may proceed through merits discovery with respect to Fage USA and Fage Holdings, but only limited jurisdictional discovery with respect to Fage Greece.  Fage Greece may, of course, conduct discovery in the New York action.  If circumstances change in the future so as to warrant resolution of all issues in a single forum, any relevant discovery from either action may be used in the other.

And, again, this Court leaves to the wise discretion of the New York court whether to stay discovery in the New York action on Fage's claim for a declaratory judgment of

45

non-infringement.  That issue is plainly the mirror image of one of General Mills' claims here.  In sum, the Court denies Fage's present motion to transfer this action to New York, or to stay it.

## III.   DOCUMENTS FILED UNDER SEAL

Various submissions of the parties in support of their motions were filed under seal.  If the parties believe that any portion of this Order warrants redaction, the Court orders the parties to show cause ten days from the date of this Order, stating why the Order should not be unsealed and specifying any portion of the order warranting redaction.

## IV.   ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Fage Holdings and Fage USA's motion to dismiss [Doc. No. 46] is **DENIED**;

2.      Fage Greece's motion to dismiss [Doc. No. 75] is **DENIED IN PART** (insofar as it joins Fage Holdings and Fage USA's Rule 12(b)(6) motion) and **DENIED WITHOUT PREJUDICE IN PART** (insofar as it seeks dismissal for lack of personal jurisdiction);

3.      General Mills may conduct jurisdictional discovery regarding Fage Greece for a period of 90 days from the date of this Order;

4.      Fage USA's motion to transfer or stay this action [Doc. No. 101] is

**DENIED**;

     5.     General Mills' motion to enjoin Defendants from proceeding with the New York action [Doc. No. 80] is **DENIED**; and

     6.     The parties are ordered to show cause within ten (10) days from the date of this Order why the Order should not be unsealed, and to specify any portion warranting redaction.


Dated:  May 11, 2012                  ___s/ Susan Richard Nelson___
                                           SUSAN RICHARD NELSON
                                           United States District Judge